UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN PABLO RIVERA CADENA,<br><br>Plaintiff,<br><br>v.<br><br>W.G. YATES & SONS CONSTRUCTION CO.,<br><br>Defendant. | No. 2:23-cv-00262-DAD-KJN<br><br>ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND REMANDING THIS ACTION TO THE SACRAMENTO COUNTY SUPERIOR COURT<br><br>(Doc. No. 10) |

This matter is before the court on the motion to remand filed by plaintiff Juan Pablo Rivera Cadena on March 13, 2023. (Doc. No. 10.) On March 22, 2023, the pending motion was taken under submission on the papers. (Doc. No. 11.) For the reasons explained below, the pending motion to remand will be granted.

**BACKGROUND**

On November 15, 2021, plaintiff filed a complaint in Sacramento County Superior Court initiating this suit against defendant W.G. Yates & Sons Construction Co., alleging that defendant violated various California wage and hour laws. (Doc. No. 1 at 2.) On February 14, 2022, plaintiff filed the operative first amended complaint ("FAC"), also in Sacramento County Superior Court. (*Id.*) In his FAC, plaintiff asserts the following eight state law claims against defendant: (1) failure to pay overtime wages in violation of California Labor Code §§ 1194, 1199; (2) failure to pay minimum wages in violation of California Labor Code §§ 1194, 1194.2,

1

1197; (3) failure to provide meal periods in violation of California Labor Code §§ 226.7, 512; (4) failure to provide rest periods in violation of California Labor Code § 226.7; (5) failure to pay all wages upon termination in violation of California Labor Code §§ 201, 202, 203; (6) failure to provide accurate wage statements in violation of California Labor Code § 226; (7) unfair competition in violation of California's Unfair Competition Law ("UCL"), Business & Professions Code §§ 17200, *et seq.*; and (8) civil penalties under California Labor Code § 2699. (Doc. No. 1 at 57, 64–74.) Plaintiff also seeks the award of attorneys' fees in connection with all claims and prejudgment interest on claims one through five. (*Id.*)

In February 2022, the parties agreed to engage in a September 2022 mediation. (Doc. No. 12-2 at 2.) As part of that agreement, defendant agreed to produce information about a representative sample of 20% of the putative class at least thirty days before the mediation date. (*Id.*) On July 29, 2022, plaintiff requested, among other things, the following information relating to defendant's California employees during the relevant time periods: the number of current and former employees, with current and former employees numerically distinguished; former employees' hiring and termination dates; the number of workweeks, shifts, pay periods, and employees within the relevant classes; average hourly wages; time records, including time cards, sign-in and sign-out sheets, and schedules; payroll records; and wage statements. (Doc. No. 10 at 25–27.) Plaintiff requested that defendant specify the overall class size as well as provide the representative random sample of time and payroll records for the putative class members. (*Id.* at 27.) Plaintiff specifically requested the random sample of time and payroll records "so that plaintiff can sufficiently evaluate the wage claims asserted." (*Id.*) In or around September 2022, defendant created a dataset ("the September Data") spanning the period of April 1, 2021, to August 7, 2022, "that was intended to be the 20% sample [defendant had] agreed to produce to plaintiff." (Doc. No. 12-2 at 2.)

However, on September 29, 2022, after plaintiff asserted that his claims also included defendant's temporary employees, defendant emailed plaintiff to explain that it did not keep the time or payroll records for its temporary employees and to request that the parties' mediation be rescheduled to December 2022 or January 2023. (Doc. No. 10 at 19.) In that same email,

defendant again agreed to provide plaintiff with a random sample of 20% of time and payroll records for the putative non-temporary class members within one month of the parties' new mediation date. (*Id.* at 20.) Mediation was then rescheduled to January 25, 2023. (*Id.* at 22.) Defendant did not produce the September Data to plaintiff until January 11, 2023 and noted that, at the time of sampling the September Data, the putative class contained approximately 699 employees. (*Id.*) Defendant further informed plaintiff that defendant was working on compiling an "updated sample" that would reflect records through "mid-December 2022." (*Id.*) By February 3, 2023, defendant had extended the September Data to cover the period from August 2022 through January 24, 2023. (Doc. No. 12-4 at 3.) This longer dataset ("the Extended Data") included approximately 1,139 putative class members, a 63% increase in putative class size from the September Data. (*Id.* at 4.) On the basis of the Extended Data and the allegations of plaintiff's FAC, defendant calculated the amount in controversy to be $17.4 million exclusive of attorneys' fees and $21.8 million including attorneys' fees.[1] (Doc. No. 1-5 at 7.)

Based on these calculations of the amount in controversy, on February 10, 2023, defendant filed its notice of removal asserting that this federal court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1441(a) and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). (Doc. No. 1.) In its notice of removal, defendant alleges that it is a citizen of Mississippi and that plaintiff is a citizen of Arizona or California for diversity jurisdiction purposes. (Doc. No. 1 at 6.)

On March 13, 2023, plaintiff filed the pending motion to remand this action back to the Sacramento County Superior Court. (Doc. No. 10.) On March 27, 2023, defendant filed its opposition to the pending motion. (Doc. No. 12.) On April 7, 2023, plaintiff filed his reply thereto. (Doc. No. 14.)[2]

---

[1] After plaintiff challenged defendant's calculations in his motion to remand, defendant revised its estimates downwards to $14.3 million (or $17.9 million with attorneys' fees) in its opposition to the pending motion for remand. (Doc. No. 12-4 at 8.)

[2] On February 15, 2023, defendant filed a motion for judgment on the pleadings, which remains pending. (Doc. Nos. 5, 7.) The court will not address that motion, however, because plaintiff's motion will be granted and this action will be remanded back to the superior court.

**LEGAL STANDARD**

A suit filed in state court may be removed to federal court if the federal court would have had original jurisdiction over the suit. 28 U.S.C. § 1441(a). Removal jurisdiction is based entirely on federal statutory authority. *See* 28 U.S.C. § 1441, *et seq*. Under the CAFA, federal courts have jurisdiction "over certain class actions, defined in [28 U.S.C.] § 1332(d)(1), if the class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84–85 (2014) (citing *Standard Fire Ins. v. Knowles*, 568 U.S. 588, 592 (2013)). While there is no presumption against removal pursuant to the CAFA, "the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction." *Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685 (9th Cir. 2006). In addition, "[a]s with all other requirements for removal jurisdiction, the defendant bears the burden of proving the timeliness of its removal . . . ." *Ali v. Setton Pistachio of Terra Bella, Inc.*, No. 1:19-cv-00959-LJO-BAM, 2019 WL 6112772, at *6 (E.D. Cal. Nov. 18, 2019) (quoting *Silva v. ER Sols., Inc.*, No. 09-cv-03365-PA-PJW, 2009 WL 1459679, at *1 (C.D. Cal. May 22, 2009)).

If removability is clear from the initial pleading, a defendant must remove the case to federal court within thirty days from the date the defendant receives the initial pleading. *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1090 (9th Cir. 2021); *see also* 28 U.S.C. § 1446(b)(1). "[I]f the case stated by the initial pleading is not removable," then the defendant faces a second thirty-day clock to remove that is triggered "after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). "If a notice of removal is filed after this thirty-day window, it is untimely and remand to state court is therefore appropriate." *Babasa v. LensCrafters, Inc.*, 498 F.3d 972, 974 (9th Cir. 2007). The second "removal clock does not start until a paper makes a ground for removal 'unequivocally clear and certain.'" *Dietrich*, 14 F.4th at 1091. "[D]efendants need not make extrapolations or engage in guesswork; yet the statute 'requires a defendant to apply a reasonable amount of intelligence in ascertaining removability.'" *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d

1136, 1140 (9th Cir. 2013) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 206 (2d Cir. 2001)).

## ANALYSIS

In the pending motion to remand, plaintiff focuses on the timeliness of defendant's removal of this action with regard to the second thirty-day clock. (Doc. No. 10.) That is, plaintiff does not argue that defendant could have determined that the case was removable based on the allegations in his initial complaint. The first thirty-day clock is therefore not at issue. Rather, plaintiff argues that defendant's removal of this action on February 10, 2023, is untimely because removability was ascertainable from his FAC and "other paper," namely the September Data, which defendant assembled, and thus received, in September 2022.[3] (*Id.* at 7.)

**A.     When Removability Became Ascertainable**

       1.     Minimal Diversity and Numerosity

Minimal diversity was ascertainable from the FAC, in which plaintiff alleges that he is a citizen of California and that defendant is a citizen of Mississippi.[4] (Doc. No. 1 at 59.) Defendant does not argue otherwise in its opposition to the pending motion to remand. Numerosity was ascertainable from the September Data, which contained records relating to 140 putative class members. (Doc. No. 10 at 22.)

---

[3] In its opposition to the pending motion, defendant argues that the September Data was created for the purpose of mediation and is therefore inadmissible to determine whether removal was timely. (Doc. No. 12 at 9–10) (citing Cal. Evid. Code § 1119). The court disagrees. The Ninth Circuit has squarely held that "the California mediation privilege" does "not preclude a determination that [a document prepared for mediation] constitute[s] § 1446(b) notice for purposes of removal to federal court." *Babasa v. LensCrafters, Inc.*, 498 F.3d 972, 975 (9th Cir. 2007) (affirming a district court order remanding a case on the basis of documents created for mediation); *see, e.g.*, *Smith v. Angelica Corp.*, No. 20-cv-01968-PJH, 2021 WL 4987951, at *2 (N.D. Cal. Oct. 27, 2021) (citing the decision in *Babasa* and noting that "even if the California mediation privilege applied to settlement demands, the court would not be precluded from considering them for purposes of determining its subject matter jurisdiction"). The court may therefore consider the September Data and the emails exchanged between counsel concerning mediation to determine if the removal of this action was timely.

[4] Defendant notes in its notice of removal that plaintiff reported in his payroll documents that he was a resident of Arizona while employed by defendant. (Doc. No. 1 at 6.) Because minimal diversity is satisfied regardless of whether plaintiff is a citizen of California or Arizona, the court need not determine plaintiff's citizenship in order to resolve the pending motion.

5

2. <u>Amount in Controversy</u>

Defendant acknowledges that "the Ninth Circuit has held that a defendant has to multiply figures 'clearly stated' in a paper to determine removability." (Doc. No. 12 at 13) (quoting *Foltz v. GEICO Indem. Co.*, No. 1:21-cv-00131-DAD-SAB, 2021 WL 3701842, at *4 (E.D. Cal. Aug. 20, 2021)); *see also Carvalho v. Equifax Info. Servs.*, 629 F.3d 876, 887 (9th Cir. 2010) (finding that removability was ascertainable when the defendant could have multiplied together numbers found in the plaintiff's responses to the defendant's deposition questions). In particular, defendants removing putative wage and hour class actions must apply reasonable intelligence to ascertain removability by multiplying numbers found in the documents specified by § 1446(b)(3). *See Gomez v. Roadrunner Transp. Servs.*, No. 23-cv-00119-JST, 2023 WL 5487663, at*4 (N.D. Cal. Aug. 23, 2023) (granting a motion to remand a case removed pursuant to the CAFA because the defendant did not multiply the number of putative class members by the minimum penalty per member when these numbers were contained in the allegations of the plaintiff's second amended complaint); *Anaya v. Mars Petcare US, Inc.*, No. 21-cv-01603-PSG-KK, 2021 WL 5578724, at *3 (C.D. Cal. Nov. 29, 2021) (noting in a CAFA case that the commencement of the second removal clock is triggered when the defendant can ascertain removability by "[m]ultiplying figures" but denying a motion to remand because the plaintiff's first amended complaint did "not provide any estimate of the weeks worked by putative class members"). Here, defendant contends that it timely removed this action once it ascertained removability by multiplying the numbers contained in the Extended Data it assembled. (Doc. No. 12 at 11.) According to defendant's data scientist Kegan Reiswig, the Extended Data contained information on all hours worked, the start and end time of each work shift on each day, and all wages paid to defendant's employees. (Doc. No. 12-4 at 4.) When analyzing the Extended Data, defendant's data scientist estimated the amount in controversy to be over $14 million (nearly $18 million with attorneys'

/////
/////
/////
/////

6

fees[5]), simply by multiplying the penalty per class member for each claim by the number of class members, then repeating that process for each of plaintiff's claims.[6]  (Doc. No. 12-4 at 4–8.)

Plaintiff contends that, had defendant applied "but a scintilla of intelligence" and multiplied together the numbers contained in the September Data, it would have been unequivocally clear and certain that the amount in controversy was over $5 million and that this case was therefore removable.  (Doc. No. 10 at 10.)  Plaintiff correctly notes in his reply in support of remand that defendant could have performed these simple calculations in September 2022 using the September Data defendant assembled, of which the Extended Data was merely an elongation.  (Doc. No. 14 at 9–10.)  Notably, defendant has not suggested that the September Data is dissimilar in any way to the Extended Data.  Indeed, the 699 employees in the September Data make up a numerical majority of the 1,139 employees included in the Extended Data.  More concretely, defendant calculated the waiting time penalties alone to be $7.1 million from the Extended Data "by multiplying 900 terminated employees [out of 1,139 total] by 8 hours per day by 30 days [the maximum permitted by statute] by $33.22 [the average hourly wage in the Extended Data]."  (Doc. No. 12-4 at 7.)  As plaintiff points out, scaling this estimate down to the number of employees in the September Data (699 employees) and using the slightly lower

---

[5] Defendant assumes attorneys' fees equal to 25% of the recovery, citing nearly a dozen cases from this district using 25% as the "benchmark" for attorneys' fees.  (Doc. No. 12 at 28); *see, e.g.*, *Alvarado v. Scholle IPN Packaging, Inc.*, No. 1:19-cv-01673-AWI-SKO, 2020 WL 6537652, at *6 (E.D. Cal. Nov. 6, 2020) ("25% of recovery is the benchmark for attorneys' fees awards on class action judgments in this circuit").

[6] Defendant argues that the allegations of plaintiff's FAC mandate the conclusion that each member of the class is entitled to recovery under the overtime, minimum wage, meal period, rest period, wage statement, and waiting time causes of action.  (Doc. No. 12 at 18–27.)  Defendant argues that "plaintiff's derivative claims for wage statement and waiting time penalties *must* reflect 100% violation rates" because plaintiff "repeatedly allege[s] that each and every putative class member[] suffered damages as a result of defendant's purportedly consistent policies of depriving employees of wages and breaks."  (Doc. No. 12 at 25) (emphasis added).  Defendant has consistently maintained that the lack of limiting language in the allegations of the FAC implies 100% violation rates, i.e., that each class member is entitled to recovery under each cause of action.  (*See, e.g.*, Doc. No. 1 at 13) (arguing in the notice of removal that the FAC "puts at issue every wage statement for every pay period during the" statutorily prescribed period).  Regardless of whether the court agrees with defendant's conclusion in this regard, it is clear that defendant understood the allegations of the FAC to require 100% violation rates for each claim and calculated its amount in controversy based on those figures.

average wage appearing in the September Data ($32.40) would still yield estimated waiting time penalties of $4.3 million. If attorneys' fees of 25% are included, the amount in controversy would be $5.4 million as to that claim alone and would satisfy the jurisdictional threshold amount.

In its opposition, defendant argues that the amount in controversy could not be determined from the FAC alone because the FAC does not "identify the total number of current and former employees in the class period, or the number of shifts, workweeks, or pay periods in the class period, or the average hourly rate paid to employees in the class period . . . or the number of wage statements provided in the class period." (Doc. No. 12 at 12.) But this information is the very data requested by plaintiff in July 2022 and compiled by defendant in September 2022 to aid the parties' mediation efforts, which inherently entailed analysis of defendant's exposure and plaintiff and the putative class's potential recovery. (Doc. No. 10 at 25–27.) Defendant then relied upon this data, extended to include data from the five months that had passed since compiling the September Data, along with plaintiff's allegations in the FAC to calculate the amount in controversy in February 2023. Plaintiff correctly points out that defendant could have easily performed identical calculations using the allegations in the FAC and the September Data in September 2022.

Defendant presents three arguments as to why the calculations could not have been performed in September 2022. The court finds none of these arguments to be persuasive. First, defendant argues that the September Data was incomplete. (Doc. No. 12 at 12.) While this is true, it must be recognized that the September Data was incomplete only in the sense that it contained "no data after August 2022." (*Id.*) Nonetheless, as illustrated above, the time period captured by the September Data would still have easily demonstrated that the amount in controversy in this action was above $5 million, likely by several millions of dollars. Second, defendant argues that calculating the amount in controversy would have been "burdensome and complex" and notes that it took ten hours for five employees "to collect the dataset that was used to calculate the AIC." (*Id.* at 12, n.1.) But however long it took to collect and clean the data is irrelevant, because defendant had already assembled and created the September Data at plaintiff's

8

1    request.  It clearly would not have been "burdensome and complex" for defendant to then

2    multiply four numbers from the data together, as defendant eventually did to estimate the amount

3    in controversy.  Third, defendant argues that "the sole purpose" of the September Data was to

4    "aid [plaintiff's] attorneys in preparing for mediation" and that defendant never analyzed the

5    September Data.  (*Id.* at 13.)  This argument appears to merely be an acknowledgement that

6    defendant did not apply a reasonable degree of intelligence in determining the amount in

7    controversy.  In short, defendant cannot evade its obligation to multiply numbers together by

8    simply stating that it did not multiply the numbers together.

9            The district court's decision in *Garcia v. Wal-Mart Stores Inc.*, 207 F. Supp. 3d 1114

10    (C.D. Cal. 2016), a similar case in which the defendant removed the plaintiff's wage and hour

11    class action to federal court pursuant to the CAFA, is particularly instructive.  In *Garcia*, the

12    district court found that the "defendant, after obtaining the number of putative class members set

13    forth in the [amended complaint in July 2015], simply calculated the amount in controversy by

14    multiplying the number of pay periods within an arbitrary set of cut-off dates" by the statutory

15    penalty rates, but "this simple computation could have been performed in May 2014, when

16    defendant determined and provided discovery responses indicating that there were more than

17    2,600 putative class members."  207 F. Supp. 3d at 1129.  Here, in response to plaintiff's informal

18    discovery request, defendant compiled even more data than did the defendant in *Garcia*,

19    including the number of putative class members, their average wages, their number of pay

20    periods, and their termination dates.  Further, as in *Garcia*, "given the variables defendant relies

21    on to arrive at the calculations upon which it bases its removal, the court is persuaded that

22    defendant could have—based on [the September Data]—ascertained removability more than

23    [thirty days] before the instant case was removed."  *Id.* at 1130.  That is, several months before

24    defendant filed its notice of removal in this case on February 10, 2023, defendant could have

25    "performed a simple computation to determine whether the [eight] claims it relies on for removal

26    were sufficient to ascertain whether the case was removable on CAFA grounds."  *Id.*

27           Because defendant could have ascertained that the amount in controversy was over $5

28    million with unequivocal clarity and certainty from the September Data with the application of

9

reasonable intelligence, the only remaining question is whether the September Data constituted "other paper" such that its assembling by defendant triggered the commencement of the second thirty-day removal clock.

### 3. Whether the September Data is "Other Paper"

Defendant argues that the Ninth Circuit has held that the thirty-day removal clocks are not triggered when a defendant elects to conduct its own investigation into removability. (Doc. No. 12 at 14) (citing *Harris v. Bankers Life and Cas. Co.*, 425 F.3d 689, 694 (9th Cir. 2005)). That is, defendant contends that only documents provided to the defendant by the plaintiff can trigger the clock; the defendant's subjective knowledge cannot do so. (*Id.* at 13–15) (citing *Harris*, 425 F.3d at 698; *Kuxhausen*, 707 F.3d at 1141; *Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1125 (9th Cir. 2013)). Defendant is correct that "a defendant does not have a duty of inquiry if the initial pleading or other document is 'indeterminate' with respect to removability" and that a "defendant's subjective knowledge cannot convert a non-removable action into a removable one." *Roth*, 720 F.3d at 1126 (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 491 (5th Cir. 1996)). However, that does not mean that an action is not removable merely because "the information supporting removal comes from the defendant rather than the plaintiff." *Id.* Moreover, none of the three Ninth Circuit decisions cited by defendant in support of this contention is on point. The defendant in *Roth* investigated the removability of the suit purely of its own accord, and the defendants in *Kuxhausen* and *Harris* did not elect to investigate removability at all. *Roth*, 720 F.3d at 1123, 1125; *Kuxhausen*, 707 F.3d at 1140–41; *Harris*, 425 F.3d at 695–96.

Here, by contrast, defendant's investigation was undertaken as the result of plaintiff's express request that defendant provide the relevant information in informal discovery. *Cf. Babasa*, 498 F.3d at 973–74 (holding that the defendant could have ascertained removability from a letter sent between counsel that "was sent in preparation for the mediation," that "concerned what it would take to make mediation meaningful," and that "confirmed some issues discussed in a recent telephone conversation regarding the size of the class and the number of incidents of violation") (internal quotations omitted). There is no question that a plaintiff's response to a

defendant's discovery request constitutes "other paper." *See Carvalho*, 629 F.3d at 887 ("Like a response to interrogatories . . . a plaintiff's response to deposition questions can constitute 'other paper' within the meaning of section 1446(b) . . . ."). The parties have cited no binding authority concerning whether a *defendant's* response to a *plaintiff's* discovery request may constitute "other paper" from which removability may be ascertained, but this court now joins the several district courts in the Ninth Circuit that have held that such responses by a defendant to a plaintiff's request may constitute "other paper." *See Garcia*, 207 F. Supp. 3d at 1130 (finding that the second thirty-day clock was triggered "when defendant determined and provided discovery responses indicating that there were more than 2,600 putative class members"); *Rhodan v. Job Options*, No. 19-cv-01141-CAB-BGS, 2019 WL 3887351, at *2–3 (C.D. Cal. Aug. 19, 2019) (holding that the defendants "were in receipt of the documents they produced to Plaintiff when they located those documents in their own files and produced them to Plaintiff in accordance with their discovery obligations in this case," and that the defendants "cannot 'ignore' documents they produced in the litigation itself that demonstrate removability"); *White v. Santa Clara Valley Water Dist.*, No. 20-cv-04242-VKD, 2020 WL 6561358 (N.D. Cal. Nov. 9, 2020) (stating that the court "finds persuasive the decision in *Rhodan*" and agreeing "that the employer could not turn a blind eye to its own documents produced in discovery"); *see also Bath v. Millennium Eng'g*, No. 22-cv-01298-ADA-CDB, 2023 WL 1315419, at *6 (E.D. Cal. Jan. 30, 2023) (agreeing with *Rhodan*'s reasoning but distinguishing it because the documents at issue in *Bath* were not "produced as a *result of* . . . [the plaintiff's] request to produce documents in discovery"); *Villanueva v. Rabobank, N.A.*, No. 23-cv-00825-CRB, 2023 WL 4051996, at *6 (N.D. Cal. June 16, 2023) (analogizing to *Rhodan* and noting that *Rhodan* "is instructive" in the remand context).

It is undisputed that defendant created the September Data at plaintiff's request pursuant to the informal discovery conducted by the parties prior to mediation, even though defendant did not produce the September Data until January 11, 2023. (*See* Doc. No. 10 at 22, 25.) Neither party has cited any authority addressing whether the thirty-day removal clock was triggered after defendant created the information at plaintiff's request in September 2022, or if the clock was

11

only triggered to commence running once defendant actually produced that information to plaintiff in informal discovery on January 11, 2023.

Given the circumstances of this case, the court concludes that the removal clock was triggered by defendant's compilation of the September Data at plaintiff's request in September 2022 because that is when simple multiplication could have been applied by defendant and removability ascertained. In reaching this conclusion, the court leans on the text of the removal statute—defendant was certainly in "receipt" of the September Data at the time defendant created it; defendant did not somehow become in "receipt" of the September Data only after producing it to plaintiff. *See* 28 U.S.C. § 1446(b)(3).[7]

The court thus finds that defendant was in receipt of "other paper," the September Data, in September 2022, several months before it filed the notice of removal on February 10, 2023. With the application of reasonable intelligence, the September Data would have made it unequivocally clear and certain to defendant that the amount in controversy was well over the $5 million jurisdictional threshold. Accordingly, the court finds that defendant has not carried its burden of showing that its removal was timely. Plaintiff's motion to remand will therefore be granted.

**B.    Motion for Judgment on the Pleadings**

Because plaintiff's motion to remand will be granted, the court does not consider defendant's motion for judgment on the pleadings, which will remain pending for decision by the superior court.

/////

/////

---

[7] The court observes that, while defendant states that it only ascertained removability in early February 2023, defendant also removed the case on February 10, 2023, exactly thirty days after finally producing the September Data to plaintiff. (Doc. Nos. 1; 12 at 11); *cf. Garcia*, 207 F. Supp. 3d at 1128 (holding that knowing the date on which the defendant ascertained removability "is not only necessary to satisfy defendant's removal burden but will also prevent gamesmanship and bad faith removals" in CAFA wage and hour cases where, as noted, defendants have control over the pertinent records). Ultimately, the specter of gamesmanship is of no moment here. The statutory text provides a sufficient basis for the court to determine that the second 30-day removal clock commenced running when the defendant created the information to be sent to a plaintiff pursuant to plaintiff's informal discovery request.

12

**CONCLUSION**

For the reasons explained above,

1. Plaintiff's motion to remand this action (Doc. No. 10) is granted;

2. This action, including the pending motion for judgment on the pleadings (Doc. No. 5), is remanded to the Sacramento County Superior Court for all further proceedings; and

3. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: **November 17, 2023**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE